# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Anderson*, 2012 IL App (1st) 103288

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARK ANDERSON, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-10-3288 |
| Filed | August 24, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a prosecution for first degree murder, attempted first degree murder and aggravated discharge of a firearm, the trial court did not err in reading the instructions on firearm enhancements in an order that contradicted the directions of the drafting committee of the Illinois Pattern Jury Instructions; however, under the "closely balanced evidence" prong of the plain-error test, defendant's conviction for attempted first degree murder was remanded for a new trial because the jury was instructed that defendant could be found guilty of attempting to murder "an individual" rather than the specific victim. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-16890; the Hon. Nicholas Ford, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Alison L.S. Shah, all of State
Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Janet
C. Mahoney, and Peter Maltese, Assistant State's Attorneys, of counsel),
for the People.

Panel

PRESIDING JUSTICE GORDON delivered the judgment of the court,
with opinion.

Justice Lampkin concurred in the judgment and opinion.

Justice Garcia dissented in part, with opinion.

## OPINION

¶ 1    Defendant Mark Anderson was charged by indictment with six counts of the first degree murder of Darryl Hart, two counts of the attempted first degree murder of Ozier Hazziez, and one count of aggravated discharge of a firearm for an incident that occurred on July 25, 2008. After a jury trial, defendant was convicted of all three charges, as well as two firearm enhancement allegations. On October 8, 2010, the trial court sentenced defendant to serve 20 years in the Illinois Department of Corrections for the first degree murder conviction, with a 25-year enhancement for the discharge of a firearm. Defendant was also sentenced to a consecutive 6-year term in prison for the attempted first degree murder conviction, with an enhancement of 20 years for the discharge of a firearm. Thus, defendant's consecutive terms amounted to a total of 71 years in the Illinois Department of Corrections.

¶ 2    On this direct appeal from the judgment of the trial court, defendant argues: (1) that the trial court erred when it instructed the jury regarding the firearm enhancements in a manner contradicting the directions of the drafting committee of the Illinois Pattern Jury Instructions, (2) that defendant's right to have the jury properly instructed was violated where the instructions for attempted first degree murder indicated "an individual" rather than the victim "Ortier Hazzier" specifically, and (3) that defendant is entitled to an additional 13 days of presentence credit.

¶ 3    For the following reasons, we find: (1) that the trial court did not err when it failed to instruct the jury on the firearm enhancements in the exact manner directed by the drafting committee, (2) that the trial court erred when it instructed the jury that the subject of the attempted first degree murder was "an individual" rather than the victim "Ortier Hazzier," and (3) that defendant is entitled to an additional 13 days of presentence credit.

¶ 4                                   BACKGROUND

¶ 5                                 I. Evidence at Trial

¶ 6        Ozier Hazziez testified, on behalf of the State, that, on July 25, 2008, shortly after 2 o'clock in the morning, he went to Orbitz Submarine restaurant on 71st Street and Euclid Avenue after leaving his job as a hotel convention worker. Another man, who was not a restaurant employee, was also in the restaurant, talking on a cellular telephone. This man was later identified as Darryl Hart. After Hazziez placed his food order, three males, whom Hazziez did not know, entered the restaurant and placed a food order. Hazziez described the three men as a tall, skinny man; a short man; and a chubby man. At trial, Hazziez identified the "tall, skinny man" as defendant. Later, another "older" man entered the store, and Hazziez observed one of the first three men sell drugs to the older man inside the restaurant.

¶ 7        Hazziez testified that Hart, the man on the cellular telephone, began to argue with the three males, stating, "You don't belong around here. This is my area." Hazziez did not hear a response from the three men. Hazziez testified that he stepped outside, remained outside for a minute, and when he returned to the inside of the restaurant, the men were still arguing. Hazziez could not hear what the men were saying, other than the bickering about who sold the drugs. Hazziez testified that Hart subsequently stepped outside the store, followed by Hazziez, and later the "tall, skinny man," whom Hazziez identified as defendant. Hazziez testified that the "chubby man," whom he identified as Quentin Cooper, was outside, as well. Hazziez testified that Hart and defendant continued to argue outside. Hart then said, "You might as well shoot me," and Hazziez observed defendant shoot Hart. Hazziez testified that defendant was 5 feet away from Hart when defendant shot Hart and that he (Hazziez) was 10 feet away from defendant when the shots were fired. After Hart fell to the ground, Hazziez "took off in [his] car" and heard three more gunshots. He was not sure in which direction the shots were fired. Hazziez testified that defendant was wearing a jacket, and Hazziez identified the jacket in the store video surveillance introduced by the State at trial. He also testified that he did not observe a weapon on Hart.

¶ 8        Hazziez testified that, after the shooting, Hazziez drove for approximately 20 minutes, then exited his vehicle to check for bullet holes. He did not find any. Hazziez subsequently went to the police station, talked to the police, and viewed two photographic arrays. In the first photographic array, he identified the "short man" from the restaurant as Centrell Jackson. In the second photographic array, which included photographs of defendant, he was initially unable to identify anyone as being present at the restaurant. Three weeks later, Hazziez returned to the police station and viewed a physical lineup, during which he identified defendant as the shooter in the July 25 incident. At trial, Hazziez identified defendant in still photographs obtained from the restaurant's surveillance video.

¶ 9        Detective Sylvia Vanwitzenburg testified on behalf of the State that Hazziez identified Jackson as the individual with the shooter. She testified that, while viewing the second photographic array at the police station (the one in which defendant appeared), Hazziez stated that one of the individuals "looked familiar," but he was not "one hundred percent sure." Vanwitzenburg testified that Hazziez said that he would be able to identify the individual if he were to see him in person.

¶ 10     The State called Quentin Cooper as a witness. Cooper had known defendant for 12 years. Cooper testified that he was at Orbitz Submarine restaurant with defendant and another friend, Centrell Jackson, on July 25, 2008, at around 2 o'clock in the morning. Cooper testified that the three placed an order and sat in the restaurant, waiting for their food. Cooper was talking to a "young man," whose name he did not know. Cooper testified that he obtained his food and went outside to his vehicle, where he waited for Jackson to receive his food. Cooper claimed that "nothing happened" while he was there. Cooper testified that he and Jackson left with defendant and that he did not remember any type of shooting at the time. According to Cooper, after leaving the restaurant, his vehicle ran out of gas five blocks from the restaurant on 71st and Cornell Streets. Cooper testified that he and Jackson walked to a gas station, purchased gas, and walked back to his vehicle. Afterwards, Cooper drove Jackson home and then drove himself home. Cooper testified that he did not see defendant again that night and did not see him again until three weeks after the incident.

¶ 11     After Cooper's testimony, the State introduced a written statement, signed by Cooper, as well as Cooper's grand jury testimony as impeaching documents. At trial, Cooper testified that he provided a written statement and grand jury testimony because a detective with whom he met on August 13, 2008, forced him to. Cooper could not remember the name of the detective. Cooper claimed that the detective told him that, if he did not sign the papers, he would be charged with the murder of Hart. Cooper testified that he told the assistant State's Attorney (ASA) and testified at the grand jury to what the detective had coached him to say. At trial, the prosecutor read Cooper his statement, and Cooper responded that he did not recall everything in the statement and that he could not recall any of his grand jury testimony.

¶ 12     Cooper testified that he could not recall whether he had a gun in his vehicle on the night of the incident. He also testified that he did not know whether Jackson had drugs on him that night and that he did not dispose of a gun during the five-block drive. Defense counsel asked Cooper whether the reason he said that he had been threatened was because he was actually the one who had shot and killed Hart. Cooper responded "no" to this question. The defense also asked if the detective said he would "put [the murder] on [Cooper]" because he believed that Cooper was the shooter, to which Cooper again responded "no."

¶ 13     Chicago police detective Darryl Shaw testified on behalf of the State that in the early morning of August 13, 2008, he interviewed Cooper at the police station. He testified that he asked Cooper to tell him what he knew about the incident that transpired at Orbitz Submarine Restaurant. Shaw testified that he never coached or told Cooper what to tell the assistant State's Attorney. He stated that he never threatened to charge Cooper with the murder of Hart if he did not testify a certain way. He also testified that Cooper was never under arrest.

¶ 14     An ASA testified on behalf of the State to the statement that Cooper provided him at the police station on August 13, 2008. The ASA testified that Cooper did not tell him that Detective Shaw had threatened to charge Cooper with the murder if Cooper did not make a statement or tell a certain story. Cooper also did not tell the ASA that Shaw told him what to say or that Shaw had coached him. The ASA told Cooper that he would like to write down what Cooper said in his statement and that Cooper would be able to review this statement and make any changes, corrections, or additions. Cooper agreed. When the ASA finished

handwriting the statement, Cooper reviewed each page, making various changes and corrections, and the ASA, Detective Shaw, and Cooper signed the bottom of each page and initialed all the changes and corrections.

¶ 15     In the handwritten statement, Cooper stated that, on July 25, 2008, he was with defendant and Jackson during the early morning hours, and that around 2 or 3 o'clock in the morning, the three went to Orbitz Submarine restaurant. At this time, Jackson served as a "macbuddy," meaning someone who sells drugs to a drug user. Cooper stated that he believed Jackson sold drugs to a drug user because he heard a man he knew as "Sizzle" (Hart) make a statement about people "serving" (or selling drugs) outside the restaurant. Cooper stated that he knew Sizzle from grade school. According to Cooper's statement, Sizzle told Jackson and defendant, "Y'all can't be serving up in here. This ain't no free enterprise. There's a war going on." Cooper stated that he observed that defendant had a gun and stepped between defendant and Sizzle. He attempted to calm the situation by telling the three of them that it "was not worth it." Cooper stated that he believed that the situation was under control because defendant walked away. Cooper stated that he walked out of the shop, followed by Sizzle. Cooper stated that he apologized to Sizzle for the fact that Jackson "served" in the shop and that he did not observe any weapons on Sizzle. Cooper stated that, while he was outside, defendant walked out of the shop with "a look in his eyes that [Cooper] had never seen" and noticed that defendant had a gun out, pointing downward in his right hand. Cooper stated that he stepped between defendant and Sizzle once again, but defendant reached around him and shot Sizzle. Sizzle fell down with the first shot, and defendant fired two more times at Sizzle. Cooper stated that defendant then turned around and fired two shots at another man, who had been in the restaurant and who had been standing outside when defendant shot Sizzle. Cooper stated that, when defendant started to shoot the gun, Cooper yelled at him to stop. Cooper stated that after the shooting, defendant tried to enter his vehicle, and Cooper told him, "Get the f*** away from me. Don't jump in my car. Hell no." Defendant then ran around the corner. Jackson then exited the restaurant, and Jackson and Cooper left the scene.

¶ 16     Another ASA testified on behalf of the State that Cooper never stated that he had been threatened by Detective Darryl Shaw, neither while Cooper was alone with the ASA nor in front of the grand jury. The ASA testified that when he asked Cooper whether anybody had threatened him or forced him to speak to him, Cooper said, "No." The ASA testified that Cooper testified to the same version of events he gave in his written statement at the grand jury proceedings. The ASA testified that Cooper identified his statement for the grand jury and testified that no threats or promises were made to him when he made the statement.

¶ 17     Centrell Jackson also testified on behalf of the State. Jackson identified defendant as a person with whom he went to grammar and high school. Jackson testified that he was present at Orbitz Submarine restaurant with Cooper and defendant in the early morning hours of July 25, 2008. Jackson stated that he did not observe defendant shoot Hart. Jackson testified that "he got into an altercation outside the store with Hart." Jackson testified that the conflict took place due to Jackson selling two bags of crack cocaine, worth $20, on Hart's "turf." Jackson testified that the drug transaction was conducted in front of the restaurant and that the individual to whom Jackson sold the cocaine did not enter the store. Jackson testified that,

when he entered the restaurant after the sale took place, Hart began to scream at Jackson. Jackson, Cooper, and defendant argued with Hart and a man with Hart, whom Jackson did not know. While Jackson was at the restaurant counter with defendant, defendant grabbed Jackson's food and left the restaurant. Jackson asked for his soft drink, and while he was waiting for it, he heard three or four shots fired. Jackson testified that, after the shots were fired, he stood inside the store for a few minutes, then walked outside, where he observed Hart lying on the ground. Jackson testified that he did not observe Hart with any kind of weapon. He testified that Cooper was also outside, but defendant was not. Cooper told Jackson to enter the vehicle with him, and the two drove home.

¶ 18    Officer Janick testified on behalf of the State that, on July 25, 2008, he was working with his partner, Officer Bruno, when he was asked to assist with the investigation and viewed a surveillance video from the restaurant. He identified defendant and Jackson on the video and gave their names to Detective Shaw. Janick testified that he encountered defendant, Jackson, and Cooper on August 12, 2008, and placed defendant in custody and brought him to the police station. Defendant did not resist arrest.

¶ 19    Forensic scientist Carl Brasic testified on behalf of the State that he investigated the crime scene on East 71st Street in the early morning hours of July 25, 2008. While searching for evidence of fired bullets, he found one metal fragment and five fired cartridge cases on the sidewalk. He collected the evidence with gloved hands and placed them in evidence envelopes, assigning inventory number 11370507 to the five fired cartridge cases, and inventory number 11370473 to the metal fragment. Additionally, Brasic testified that he recovered a green and yellow "Athletics" jacket, which he recovered with gloved hands, placed in a paper bag, and assigned inventory number 11370508. Brasic testified that he also found a package of cigars and five loose cigarettes in the right outside pocket of the jacket, which he inventoried under number 11370510. At trial, Brasic viewed the evidence and stated that each item was sealed and in the same condition as when he originally recovered it.

¶ 20    Forensic scientist Cynthia Engelking Prus testified on behalf of the State that she was an expert in fingerprint analysis. She testified that she tested the five cartridge cases for fingerprints and determined that there were no latent impressions suitable for comparison. She then tested a matchbook, a package of cigars, and five cigarettes. Prus testified that she found a latent print suitable for comparison on one of the cigarettes. She compared the latent print to an inked palm print card marked "Mark Anderson." Prus opined, based on a reasonable degree of scientific certainty, that the print on the cigarette matched the inked print for defendant.

¶ 21    The parties stipulated that forensic scientist Scott Rochowicz of the Illinois State Police was qualified as an expert in the field of trace evidence. It was stipulated that, if called to testify, Rochowicz would testify that he tested the Athletics jacket for gun residue, taking samples from the right and left cuffs. The results indicated that the sample areas "may not have contacted a PGSR [primer gunshot residue] related item or may not have been in the environment of a discharged firearm."

¶ 22    The parties also stipulated that the cause of death of Hart was multiple gunshot wounds

and that the manner of death was homicide. The parties also stipulated that the paramedics recovered nine clear plastic bags containing cocaine from Hart's mouth. The parties stipulated to the testimony that the bullets were all fired from the same gun and that the proper chain of custody was maintained.

¶ 23 After the State rested, the trial court heard and denied defendant's motion for a directed verdict. Defendant informed the trial court that he did not wish to testify, and the defense called no witnesses or evidence in defendant's case-in-chief.

¶ 24 After closing arguments, the trial court instructed the jury. The trial court first instructed the jury regarding the first degree murder, the attempted first degree murder, and the aggravated discharge of a weapon charges. The court also instructed the jury regarding the allegations that defendant personally discharged a firearm that proximally caused death and the allegations that during the commission of attempted first degree murder, defendant personally discharged a firearm. Additionally, the issues instruction provided to the jury for the attempted first degree murder offense stated, "A person commits the offense of attempt first degree murder when he *** with the intent to kill *an individual* does an act which constitutes a substantial step toward the killing of *an individual*. The killing attempted need not have been accomplished." (Emphases added.)

¶ 25 After retiring, the jury sent out a question asking for the transcript of the previous day's court hearing. There were no objections, and the trial court sent the transcript to the jury. The jury then asked if Hazziez testified at the grand jury and asked for a transcript. The trial court responded: "You have heard the evidence in this case, please continue your deliberations." The jury was sequestered overnight and resumed deliberations the next morning. The next morning, the jury sent out a third note asking, "Do we vote on one of the four allegation forms or for each allegation?" The court responded with, "You should sign one verdict form as to each allegation should you reach verdicts."

¶ 26                                    II. Conviction and Sentencing

¶ 27 The jury found defendant guilty of first degree murder, attempted first degree murder, and aggravated discharge of a firearm. The jury also found that defendant personally discharged a firearm during the commission of the first degree murder offense that caused death to another person and that defendant discharged a firearm during the commission of the offense of attempted first degree murder.

¶ 28 On October 8, 2010, after heading aggravation and mitigation, the trial court sentenced defendant to serve 20 years in the Illinois Department of Corrections for the first degree murder conviction, with a 25-year enhancement for the discharge of a firearm. Defendant was also sentenced to a consecutive 6-year term in prison for the attempted first degree murder conviction, with an enhancement of 20 years for the discharge of a firearm. Thus, defendant's consecutive terms amounted to a total of 71 years in the Illinois Department of Corrections. The trial court gave defendant credit for 774 days served in presentence custody. On October 28, 2010, defendant filed a notice of appeal, and this appeal followed.

¶ 29                              ANALYSIS

¶ 30    There are three main issues on this direct appeal: (1) whether the trial court erred when it instructed the jury regarding the firearm enhancements in a manner contradicting the directives of the drafting committee of the Illinois Pattern Jury Instructions, Criminal, (2) whether defendant's right to have the jury properly instructed about the charged offenses was violated where the instructions for attempted first degree murder indicated "an individual" rather than the victim "Ozier Hazzier," and (3) whether defendant is entitled to an additional 13 days of presentence credit for time served.

¶ 31    For the following reasons, we find: (1) that the trial court did not err when it failed to instruct the jury on the firearm enhancements in the exact manner directed by the drafting committee of the Illinois Pattern Jury Instructions, Criminal, (2) that the trial court erred when it instructed the jury that the subject of the attempted first degree murder was "an individual" rather than the victim, "Ozier Hazzier," and (3) that defendant is entitled to an additional 13 days of presentence credit for time considered served.

¶ 32                          I. Standard of Review

¶ 33    A reviewing court will generally review jury instructions only for an abuse of discretion. The decision whether or not to give the instruction is within the sound discretion of the trial court; however, there must be evidence in the record to justify giving a particular instruction. *People v. Hammonds*, 409 Ill. App. 3d 838, 849 (2011). Abuse of discretion will be found where no reasonable person could agree with the position of the lower court. *Matthews v. Avalon Petroleum Co.*, 375 Ill. App. 3d 1, 9 (2007).

¶ 34    Although jury instructions are generally reviewed for an abuse of discretion, our standard of review is *de novo* when the question is whether the applicable law was accurately explained to the jury. *People v. Hammonds*, 409 Ill. App. 3d 838, 849 (2011) (quoting *Barth v. State Farm Fire & Casualty Co.*, 228 Ill. 2d 163, 170 (2008)). Under the *de novo* standard of review, the reviewing court does not need to defer to the trial court's judgment or reasoning. *People v. Vincent*, 226 Ill. 2d 1, 14 (2007). *De novo* review is completely independent of the trial court's decision. *United States Steel Corp. v. Illinois Pollution Control Board*, 384 Ill. App. 3d 457, 461 (2008).

¶ 35    Finally, whether a mittimus should be corrected is a question of law and will therefore also be reviewed *de novo*. *People v. Kruger*, 175 Ill. 2d 60, 64 (1996). Because sentence credit for time served is mandatory, such a claim of error cannot be waived (*People v. Whitmore*, 313 Ill. App. 3d 117, 121 (2000)), and an amended or corrected mittimus may be issued at any time (*People v. Quintana*, 332 Ill. App. 3d 96, 110 (2002)).

¶ 36                          II. Jury Instruction
¶ 37                          A. Firearm Instruction

¶ 38    Defendant argues that, according to the Illinois Pattern Jury Instructions, Criminal, the firearm enhancement jury instructions should have been interspersed throughout the reading of the instructions, following "immediately after" the applicable 2.01 series, No. 2.03 series,

-8-

No. 26.03, and the issues instruction for the offense to which each enhancement applied. Illinois Pattern Jury Instructions, Criminal, No. 28.01, Committee Note (4th ed. Supp. 2009) (hereinafter, IPI Criminal 4th No. 28.01 (Supp. 2009)); Illinois Pattern Jury Instructions, Criminal, No. 28.02, Committee Note (4th ed. Supp. 2009) (hereinafter, IPI Criminal 4th No. 28.02 (Supp. 2009)); Illinois Pattern Jury Instructions, Criminal, No. 28.03, Committee Note (4th ed. Supp. 2009) (hereinafter, IPI Criminal 4th No. 28.03 (Supp. 2009)); Illinois Pattern Jury Instructions, Criminal, No. 28.04, Committee Note (4th ed. Supp. 2009) (hereinafter, IPI Criminal 4th No. 28.04 (Supp. 2009)). The initial, unitary instructions of the enhancements should follow "immediately after the applicable 2.01 series instruction." IPI Criminal 4th No. 28.01, Committee Note (Supp. 2009). Additionally the issues instruction for the enhancements should follow "immediately after the issues instruction for the offense to which the enhancement/extended term factor applies." IPI Criminal 4th No. 28.03, Committee Note (Supp. 2009). Finally, the concluding instruction regarding the enhancements should be given "immediately after the applicable 26.01 series instruction." IPI Criminal 4th No. 28.04, Committee Note (Supp. 2009).

¶ 39 In the case at bar, the trial court did not provide the relevant firearm enhancement instructions immediately after the 2.01 series, 2.03 series, 26.01 series, or the issues instructions for the offense to which the enhancements applied. The trial court first read the jury instructions regarding first degree murder, attempted first degree murder, and aggravated discharge of a weapon, in addition to the general instructions. After reading the six verdict forms for first degree murder, attempted first degree murder, and aggravated discharge of a weapon, the trial court then read the jury instructions for the firearm enhancements and the verdict forms for the enhancement charges. Therefore, the manner in which the trial court judge instructed the jury contradicted the drafting committee's directives. The issue is whether it was an accurate recitation of the law and whether it confused the jury.

¶ 40 Jury instructions are intended to convey to the jury the correct principles of law applicable to the evidence submitted so that the jury can "arrive at a correct conclusion according to the law and the evidence." *People v. Pinkney*, 322 Ill. App. 3d 707, 717 (2000). "Jury instructions should not be misleading or confusing." *Pinkney*, 322 Ill. App. 3d at 717. Illinois courts have acknowledged that "while committee comments are not the law, the trial court is allowed to deviate from the suggested instruction and format only where necessary to conform to unusual facts or new law." *People v. Banks*, 287 Ill. App. 3d 273, 280 (1997). "Illinois pattern instructions have been painstakingly drafted" and "[t]rial judges should not take it upon themselves to second-guess the drafting committee where the instruction in question clearly applies." (Internal quotation marks omitted.) *People v. Durr*, 215 Ill. 2d 283, 301 (2005). When an IPI criminal instruction does not accurately state the law with respect to a particular subject, the trial court may, in its discretion, give a non-IPI instruction on the subject. *People v. Bush*, 157 Ill. 2d 248, 253 (1993). However, "Supreme Court Rule 451(a) requires that in a criminal case, if the court determines the jury should be instructed on a subject, and the Illinois Pattern Jury Instruction (IPI), Criminal, contains an applicable instruction, then the IPI instruction 'shall' be given unless the court determines it does not accurately state the law." *People v. Hopp*, 209 Ill. 2d 1, 7 (2004).

¶ 41 The trial court gave the applicable IPI jury instructions, but defendant argues that by

instructing the jury in a manner contrary to the drafting committee's suggestions, the trial court violated defendant's right to a fair trial by causing juror confusion. Defendant claims that the notes sent by the jurors to the trial court during their deliberation evidenced this confusion. Defendant refers specifically to the note that asked the trial court, "Do we vote on one of the four allegation forms or for each allegation?" Defendant argues that this confusion could have been avoided if the trial court had read the firearm enhancement instructions in its proper order.

¶ 42    The State argues that defendant has forfeited both of the issues argued by defendant: (1) that the manner in which the firearm instructions were read was flawed and (2) that the attempted first degree murder instruction was flawed in failing to specifically name the victim of the charge, by raising these issues for the first time on appeal. The State notes that defense counsel received a copy of the instructions that the State was proposing and that defense counsel stated that he did not wish to add any additional instructions. Defense counsel also did not raise any objections to the proposed instruction, other than to Illinois Pattern Jury Instructions, Criminal, No. 3.02 (2d ed. 1981), which explained circumstantial evidence, and did not object to the order in which the trial court read the instructions. Defendant filed a posttrial motion for a new trial, which did not include any claim of improper jury instructions or the order in which the instructions were read. The State argues that, therefore, under Illinois Supreme Court Rule 451 (eff. July 1, 2006), defendant forfeited his right to obtain review of any jury instruction error, if there was one.

¶ 43    Our supreme court has found that a defendant will be considered to have forfeited his right for review of a jury instruction error if he failed to object to the instruction at trial and did not raise the issue in a posttrial motion. *People v. Sargent*, 239 Ill. 2d 166, 188-89 (2010). Although trial counsel failed to object to the manner in which the jury instructions were to be read at the instructions conference and also failed to include the alleged error in his posttrial motion, Illinois Supreme Court Rule 451(c) (eff. July 1, 2006), states that substantial defects in criminal jury instruction "are not waived by failure to make timely objections thereto if the interests of justice require." This rule is meant to correct grave or serious errors and errors in cases so factually close that fundamental fairness requires that the jury be properly instructed. *People v. Sargent*, 239 Ill. 2d 166, 189 (2010). The rule is coextensive with the plain-error clause of Supreme Court Rule 615(a), which provides: " 'Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court.' " *Sargent*, 239 Ill. 2d at 189 (quoting Ill. S. Ct. R. 615(a)).

¶ 44    The plain-error doctrine allows a reviewing court to consider an unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Sargent*, 239 Ill. 2d at 189; *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Defendant bears the burden of persuasion regarding whether the evidence was closely balanced or whether the error was so serious that it affected

the fairness of his trial and challenged the integrity of the judicial process. *People v. Herron*, 215 Ill. 2d 167, 178 (2005). In Illinois, the "closely balanced evidence" prong of the plain-error rule defends against errors that could lead to the conviction of an innocent person (*People v. Mullen*, 141 Ill. 2d 394, 402 (1990)), while the "substantial rights" prong defends against errors that erode the integrity of the judicial process and undermine the fairness of the defendant's trial (*People v. Keene*, 169 Ill. 2d 1, 17 (1995)).

¶ 45     In order for there to be plain error, we must first find error. *Piatkowski*, 225 Ill. 2d at 565. In the case at bar, we find that there was no error regarding the order in which the jury instructions were read. As stated above, jury instructions are intended to convey to the jury the correct principles of law applicable to the evidence submitted so that the jury can "arrive at a correct conclusion according to the law and the evidence." *People v. Pinkney*, 322 Ill. App. 3d 707, 717 (2000). Although the instructions were not read to the jury in the precise order directed by the drafting committee, the trial court clearly conveyed the applicable law and the proper instructions to the jury. *LaSalle Bank, N.A. v. C/HCA Development Corp.*, 384 Ill. App. 3d 806, 818 (2008) (finding that a jury instruction that deviated from committee directives did not prejudice defendants because the instruction was still an accurate statement of the applicable law). Even when a trial court gives faulty instructions, a reviewing court will not review a trial court's decision unless the instruction clearly misled the jury and resulted in prejudice to the defendant. *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 273 (2002).

¶ 46     The jury note which asked the trial court whether the jury was to vote on one or each of the four allegations does not demonstrate that the jury was misled or confused by the order in which the instructions were read, which therefore caused it to arrive at an incorrect conclusion. Based on the evidence presented, the jury found defendant guilty of the first degree murder of Hart and that defendant discharged a firearm in the commission of that murder. We will not overturn defendant's guilty verdict based on a technicality when the jury was incontestably provided with the applicable and correct law and jury instructions. Therefore, we do not find that the trial court erred in deviating from the firearm enhancement directives provided by the drafting committee.

¶ 47     The job of drafting pattern jury instructions and the order in which they are to be read to the jury was not given to the trial courts or the appellate courts. Our Illinois Supreme Court gave that job to a committee on pattern jury instructions and requires its lower courts to follow the directives of the committee, unless the committee failed to state the law accurately. *LaSalle*, 384 Ill. App. 3d at 818.

¶ 48     Even if we were to find error in the order in which the trial court read the jury instructions, this error would not rise to the level of plain error under either the "closely balanced evidence" test or the "substantial rights" test of the plain-error analysis.

¶ 49     Regarding the "closely balanced evidence" test, in *People v. Herron*, 215 Ill. 2d 167 (2005), our supreme court affirmed the appellate court's finding of plain error based on closely balanced evidence. In that case, the State's case was based almost solely on the testimony of witness Comanse and his identification of defendant. In his testimony, Comanse described defendant, whom he had never seen before, as 5 feet 10 or 11 inches tall and stated

that he viewed the man's face for approximately 20 to 25 seconds before he complied with defendant's demand to lie facedown on the floor. Comanse viewed a photo lineup that day but did not identify anyone. Sixteen months later, Comanse identified defendant from a lineup. Comanse's description of the man who held a gun to him conflicted with the account of another witness, who testified that the man was shorter than her and was "probably" 5 feet 5 inches tall. Defendant was 5 feet 11 inches tall. Although this witness observed both men enter the lobby and approach the front desk and also aided the shorter man in opening the cash drawer to take the money, she never identified defendant. Additionally, the State's other three eyewitnesses could not identify defendant. *Herron*, 215 Ill. 2d at 173-74.

¶ 50     Similarly, in *People v. Piatkowski*, 225 Ill. 2d 551 (2007), our supreme court found that the evidence was closely balanced. In that case, the State presented no physical evidence to connect defendant to the shooting, and no inculpatory statements by defendant were admitted. The only evidence linking defendant to the crime was the sketchy testimony of two eyewitnesses, and the erroneous jury instruction in the case related specifically to how the jury would asses the reliability of eyewitnesses' testimony caused the supreme court to order a new trial. *Piatkowski*, 225 Ill. 2d at 567-68.

¶ 51     The facts of the case at bar are distinguishable from *Herron* and *Piatkowski*. Hazziez, Cooper, and Jackson all placed defendant at the scene of the crime in the early morning hours of July 25, 2008. Cooper and Jackson both knew defendant prior to the incident, Cooper having known defendant for 12 years and Jackson having known defendant since grammar school. Unlike in the aforementioned cases, there was physical evidence linking defendant to the shooting, specifically the Athletics jacket, which defendant was observed wearing both by Hazziez and in the restaurant's surveillance video, and the cigarette, which had fingerprints that matched those of defendant. Hazziez and Cooper both stated that they observed defendant engage in an argument with Hart, display a gun, and shoot Hart. Hazziez, Cooper, and Jackson each stated that they did not observe a weapon on Hart. There is no evidence that any other individual at the scene of the crime had a weapon. The shell casing and fired bullet jackets that were recovered from the crime scene and tested verified that only one gun was utilized that night. Additionally, Hazziez testified that he stood 10 feet away from defendant at the time when defendant shot Hart and that he had previously observed defendant's appearance while inside the restaurant. Even though he could not identify defendant with certainty in the photographic array on the night of the incident, Hazziez stated that he would recognize the shooter if he were to see him in person, and he later identified defendant at trial and in a pretrial lineup at the police station, which took place three weeks after the incident. The fact that Cooper recanted his written statement and grand jury testimony does not, in itself, render the evidence closely balanced. *People v. Fields*, 285 Ill. App. 3d 1020, 1030-31 (1996) (the defendant's conviction upheld where the only witnesses placing the defendant at the scene disclaimed their previous statements at trial). Therefore, we do not find the evidence in this case to be closely balanced.

¶ 52     Additionally, we do not find defendant's plain-error argument under the "substantial rights" test to be persuasive. The fact that the trial court did not read the jury instructions in the precise order directed by the drafting committee of the Illinois Pattern Jury Instructions, Criminal, was not an error so serious that it affected the fairness of defendant's trial,

particularly since the trial court clearly conveyed the applicable law and the proper instructions to the jury. Moreover, this deviation from the directives of the drafting committee is not so grave as to threaten the integrity of the judicial process. *Herron*, 215 Ill. 2d at 178. Therefore, even if this court were to find error in the trial court's order of reading the jury instructions in this case, that error would not rise to the level of plain error.

¶ 53    Alternatively, defendant argues that defense counsel's failure to preserve this error in a posttrial motion demonstrates that his counsel was ineffective. *People v. Eddmonds*, 101 Ill. 2d 44, 65-66 (1984). A defendant has a constitutional right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984); *People v. Albanese*, 104 Ill. 2d 504, 525-26 (1984); see also U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Counsel provides ineffective assistance where (1) counsel's decisions were objectively unreasonable and (2) a reasonable probability exists that but for counsel's deficient performance, the outcome of the trial would have been different. *Strickland*, 466 U.S. at 687-89; *Albanese*, 104 Ill. 2d at 525-26. Defendant argues that it was objectively unreasonable for counsel to fail (1) to object to the trial court's failure to read the jury instructions in the order directed by the drafting committee or (2) to include the error in a posttrial motion. Defendant also argues that he suffered prejudice due to the fact that this issue was not fully preserved. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). We find this argument to be unpersuasive. Given that the deviation from the drafting committee's directives regarding the order of the instructions was not erroneous, it was not objectively unreasonable for defense counsel to fail to address this issue through objection or a posttrial motion. Moreover, there is not a reasonable probability that the outcome of the trial would have been different had the instructions been read in the directed order. Thus, we cannot find ineffective assistance of counsel in this case.

¶ 54    Therefore, we affirm defendant's first degree murder and related firearm enhancement convictions and sentences.


¶ 55                    B. Attempted First Degree Murder Instruction

¶ 56    Secondly, defendant argues that the jury was improperly instructed regarding the attempted first degree murder offense. Defendant was charged with the first degree murder of Darryl Hart and the attempted first degree murder Ozier Hazziez. The jury was instructed that it could find defendant guilty of attempting to murder "an individual," as opposed to specifically the victim Ozier Hazziez. Defendant argues that based on the provided instructions, the jurors could have concluded that defendant was guilty of the attempted murder of Hart, rather than of Hazziez.

¶ 57    " 'The sole function of instructions is to convey to the minds of the jury the correct principles of law applicable to the evidence submitted to it in order that *** the jury may, by the application of proper legal principles, arrive at a correct conclusion according to the law and the evidence.' " *People v. Ramey*, 151 Ill. 2d 498, 535 (1992) (quoting *People v. Gambony*, 402 Ill. 74, 81-82 (1948)). Jury instructions should not be misleading or confusing, and their correctness depends on whether "ordinary persons acting as jurors would fail to understand them." *People v. Herron*, 215 Ill. 2d 167, 187-88 (2005). In such a case,

a defendant must show that the claimed instructional error " 'creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial.' " *People v. Durr*, 215 Ill. 2d 283, 299 (2005) (quoting *People v. Hopp*, 209 Ill. 2d 1, 8 (2004)).

¶ 58    In the case at bar, the issues instruction for attempted first degree murder provided to the jury stated:

"To sustain the charge of attempted first degree murder, the State must prove the following propositions: First: That the defendant or one for whose conduct he is legally responsible, performed an act which constituted a substantial step toward the killing of an individual; and, second: That the defendant, or one for whose conduct he is legally responsible, did so with the intent to kill an individual.

A person commits the offense of attempt first degree murder when he *** with the intent to kill an individual does an act which constitutes a substantial step toward the killing of an individual. The killing attempted need not have been accomplished."

¶ 59    Defendant argues that, based on the plain and ordinary meaning of the instruction, the jury could have rendered a guilty verdict for the attempted first degree murder by finding that defendant attempted to murder any "individual," including Hart. Defendant notes that the trial court did not clarify to the jury that the attempted first degree murder offense referred only to Hazziez.

¶ 60    Under Illinois Supreme Court Rule 451(c) (eff. July 1, 2006), where a jury instruction suffers from a substantial defect, claims of error are not subject to forfeiture on appeal. An erroneous instruction constitutes a substantial defect, or plain error, when the flawed instruction created a serious risk that the defendant was incorrectly convicted because the jury did not understand the applicable law, so as to threaten the fundamental fairness of defendant's trial. *People v. Durr*, 215 Ill. 2d 283, 299 (2005) (quoting *People v. Hopp*, 209 Ill. 2d 1, 8 (2004)). A defendant does not need to prove that the error in the instruction actually misled the jury. *People v. Herron*, 215 Ill. 2d 167, 193 (2005). "When there is error in a close case, we choose to err on the side of fairness, so as not to convict an innocent person." *Herron*, 215 Ill. 2d at 193. As stated previously, plain error arises in two circumstances: (1) when the flawed instruction was provided in a case where the evidence was closely balanced or (2) when the flaw in the instruction is "grave" or so serious that it denied the defendant a substantial right and undermined the integrity of the judicial process. *Herron*, 215 Ill. 2d 178-79.

¶ 61    Although the jury instructions provided here were taken from the Illinois Pattern Jury Instructions, Criminal, it is probable that the "ordinary person" in the jury would not understand that the subject of the attempted first degree murder charge was *only* Hazziez. Illinois courts have acknowledged that the trial court may deviate from the suggested IPI instruction in order to conform to the facts of the case. *People v. Banks*, 287 Ill. App. 3d 273, 280 (1997). In this case, the trial court only needed to clarify in the instructions that the "individual" referred to in the attempted murder charge was specifically Hazziez to avoid potential juror confusion regarding the murder's victim, Hart.

¶ 62    At the beginning of the trial, the court read to the jury the charges of indictment, which

stated, "It will be asserted that *** [defendant] committed the offense of attempted first-degree murder in that *** [defendant] shot at Ozier [Hazziez] while armed with a firearm ***." The State also informed the jury at the conclusion of the trial during its closing argument that the subject of the attempted first degree murder charge was Hazziez. However, the jury was instructed before deliberation that the indictment and the closing arguments were not to be considered as evidence against defendant.

¶ 63        The State cites *People v. Stevenson*, 198 Ill. App. 3d 376, 381-82 (1990), in which the appellate court found that the State's opening statement and the defendant's closing argument were sufficient to overcome any ambiguity of the issues of defendant's mental state, which was allegedly caused by the jury instruction. *People v. Stevenson*, 198 Ill. App. 3d 376, 381-82 (1990). However, *Stevenson* is distinguishable from this case. The issue in *Stevenson* was whether the jury could find the defendant guilty of attempted murder based on either intent to kill or intent to do great bodily harm. The court in *Stevenson* found that where the evidence was not close and where both the prosecutor and defense counsel addressed the required intent to kill, there was no reversible error. In the case at bar, defense counsel never discussed to whom the attempted murder instruction applied, and we find that the few comments made by the prosecutor relating to the issue did not clarify that the attempted murder offense referred only to Hazziez, particularly when the jury was instructed that those comments were not to be considered as evidence.

¶ 64        Therefore, we find that the confusing nature of the jury instruction, which failed to specify that the subject of the attempted murder charge was only Hazziez, rendered the instruction erroneous under the narrow set of facts of this case. We must now determine whether (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant or (2) that the error is so serious that it affected the fairness of defendant's trial and challenged the integrity of the judicial process. *Sargent*, 239 Ill. 2d at 189.

¶ 65        We find that the evidence regarding the attempted first degree murder of Hazziez was closely balanced. The only evidence presented by the State regarding the attempted first degree murder offense was the statements and testimony of Hazziez and Cooper. Hazziez testified that he observed defendant shoot Hart and that he heard more shots after the shooting; however, he stated that he did not know the direction in which they were fired as he ran to his vehicle, jumped inside, and left the scene. He did not observe defendant shoot him. Hazziez also testified that he did not find any bullet holes in his vehicle. In his handwritten statement and grand jury testimony, Cooper stated that defendant turned around and shot at "another person" after shooting Hart; however, there is no evidence which demonstrates that this "other person" was Hazziez. Moreover, Cooper was asked at trial if he told the ASA that defendant "started firing at another guy," and Cooper stated that he had not made that statement. The fact that Cooper later recanted his written statement and grand jury testimony also affected his reliability as a witness and contributed to the evidence being closely balanced.

¶ 66        Under the "closely balanced evidence" prong, a defendant must show that the verdict "may have resulted from the error and not the evidence." (Internal quotation marks omitted.) *People v. White*, 2011 IL 109689, ¶ 133. In this case, the evidence regarding whether

-15-

defendant fired the gun in the direction of Hazziez was closely balanced. The fact that the jury instructions did not specify that Hazziez was the subject of the attempted murder charge may have allowed the jury to convict defendant of attempted first degree murder based on the flawed instruction rather than the evidence. Namely, the jury could have found that defendant attempted to kill, and then succeeded in killing, Hart. This potential confusion was demonstrated in the three notes released by the jury, two of which involved the attempted first degree murder charge. One asked for a transcript of the previous day's hearing, during which Hazziez and Cooper testified. The second asked if Hazziez testified at the grand jury and, if so, whether the jury could be given a transcript of the testimony. Thus, we find that defendant satisfied the "closely balanced evidence" prong of the plain-error test.

¶ 67    Therefore, we find that the trial court erred in failing to specify in the jury instructions that the subject of the attempted murder charge was only Hazziez. As a result, this cause must be reversed and remanded to the trial court for a new trial on the attempted murder charges.

¶ 68                                III. Presentence Credit

¶ 69    Finally, the trial court awarded defendant 774 days of presentence credit; however, the record indicates that defendant spent 787 days in pretrial custody. A defendant is entitled to credit for any part of any day that he spends in custody. 730 ILCS 5/5-4.5-100 (West 2008); *People v. Bussan*, 306 Ill. App. 3d 836, 840 (1999). The State does not have an objection to the defendant's mittimus being corrected to reflect a presentence credit of 787 days. Therefore, we order the clerk of the circuit court to correct defendant's mittimus to 787 days of credit. Ill. S. Ct. R. 615(b)(1); *People v. Alvarez-Garcia*, 395 Ill. App. 3d 719, 734 (2009).

¶ 70                                    CONCLUSION

¶ 71    For the foregoing reasons, we find: (1) that the trial court did not err when it failed to instruct the jury on the firearm enhancements in the order directed by the drafting committee of the Illinois Pattern Jury Instructions, Criminal, (2) that the trial court erred when it instructed the jury that the subject of the attempted first degree murder was "an individual" rather than "Ozier Hazzier," and (3) that defendant is entitled to an additional 13 days of presentence credit.

¶ 72    Affirmed in part and reversed in part; cause remanded.

¶ 73    JUSTICE GARCIA, dissenting in part.

¶ 74    I agree with the majority that plain error occurred when the jury was instructed that to find the defendant guilty of attempted first degree murder, it need only find that the offense was committed against "an individual." *Supra* ¶¶ 64-65. I dissent because the evidence as to the victim of the attempted murder charge was so lacking that a retrial of the defendant would violate his constitutional right against double jeopardy. See *People v. Taylor*, 76 Ill. 2d 289, 309 (1979) (" 'The Double Jeopardy Clause forbids a second trial for the purpose of

-16-

affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding.' " (quoting *Burks v. United States*, 437 U.S. 1, 11 (1978))).

¶ 75 As the majority states, "The only evidence presented by the State regarding the attempted first degree murder offense was the statements and testimony of Hazziez and Cooper." *Supra* ¶ 65. I agree with the majority that the evidence demonstrates that "[Hazziez] did not observe the defendant shoot [at] him." *Supra* ¶ 65. I also agree with the majority that "Cooper stated that defendant turned and shot at 'another person' after shooting Hart; however, there is no evidence [that] demonstrates that this 'other person' was Hazziez." *Supra* ¶ 65. As the defendant argues, the improperly worded instruction permitted the jury to convict the defendant even if it concluded that the victim of the attempted murder instruction was the murder victim Hart or some other individual. In this regard, I repeat the majority's observation that Centrell Jackson testified that there was another "man with Hart, whom Jackson did not know." *Supra* ¶ 17. This other "man with Hart" gave the jury yet another choice as to the possible victim of the attempted murder charge. In fact, based on the wording of the instruction, the 12 jurors might well have signed the guilty verdict form though they were not unanimous as to the identity of the attempted murder victim. Ultimately, the wording of the jury instruction compels the conclusion the majority implicitly reaches that I state explicitly: the defendant's conviction of attempted first degree murder in this case resulted from the jury instruction error and not from the evidence. *Supra* ¶ 66.

¶ 76 When we consider the woefully inadequate evidence presented by the State on the identity of the attempted murder victim, the plain error jury instruction compels that we reverse without remand for a new trial. See *Burks*, 437 U.S. at 16 ("when a defendant's conviction has been overturned due to a failure of proof at trial, *** the prosecution cannot complain of prejudice, for it has been given one fair opportunity to offer whatever proof it could assemble"). While the defendant failed to raise an express contention before this court that the evidence was insufficient to prove his guilt of attempted first degree murder beyond a reasonable doubt, his contention that "the jury could have found defendant guilty of attempted first degree murder without finding that he possessed the requisite specific intent to kill Hazziez" permits us to address the sufficiency of the evidence on that charge. See *People v. Enoch*, 122 Ill. 2d 176, 190 (1988) (sufficiency of the evidence is not subject to forfeiture); Ill. S. Ct. R. 615(b)(2) (the powers of the reviewing court include the authority to "set aside *** the proceedings *** from which the appeal is taken"). "When an appellate court reverses a criminal conviction and remands the case for a new trial without deciding defendant's contention that the evidence at the first trial was insufficient, we believe that the court risks subjecting the defendant to double jeopardy." *Taylor*, 76 Ill. 2d at 309.

¶ 77 To be clear, the improper wording of the jury instruction on attempted first degree murder explains the jury's guilty verdict given that the State failed to muster any evidence that the defendant acted with specific intent to kill Hazziez. Moreover, the wording of the jury instruction permitted a guilty finding without unanimity by the twelve jurors as to the defendant's specific intent to kill one of at least three possible victims of the attempted murder charge because evidence of the intended target was insufficient. Where the attempted murder jury instruction did not require all 12 jurors to agree as to the intended target of the defendant's alleged specific intent to kill, we cannot say that the jury arrived at its conclusion

according to the evidence. See *People v. Pinkney*, 322 Ill. App. 3d 707, 717 (2000) ("cause of death instruction was misapplied in this case and has no basis in the evidence"). Nor was proof sufficient that the defendant attempted to kill Hazziez by shooting at him as he drove away from the scene of the killing of Hart when no witness identified Hazziez as the target of the defendant's gunfire. There is no authority for the State's implicit contention that it can satisfy its burden to prove the defendant's guilt beyond a reasonable doubt as to the element of specific intent to kill by permitting the jury to infer the identity of the attempted murder victim from evidence that is insufficient rather than merely ambiguous. *Cf. People v. Fountain*, 2011 IL App (1st) 083459-B, ¶ 14 (an inference beyond a reasonable doubt cannot be drawn as to an element of the offense when insufficiently tested nonhomogenous contraband is involved).

¶ 78      I conclude that attempted murder was not proven beyond a reasonable doubt. I would, however, remand the cause to the circuit court to impose sentence on the defendant's conviction of aggravated discharge of a firearm, which the trial judge merged with the attempted murder conviction. See *People v. Scott*, 69 Ill. 2d 85, 88 (1977) (appellate court properly remanded cause to the circuit court to impose sentence on conviction that the trial court "merged" with another conviction).

¶ 79      Accordingly, I dissent from that portion of the majority's decision that remands this cause for a new trial on attempted first degree murder. *Supra* ¶ 67.